Filed 5/19/22  In re Jacob. D. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| In re JACOB D., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, | G060929 |
| Plaintiff and Respondent, | (Super. Ct. No. 19DP0001) |
| v. | O P I N I O N |
| CARRIE P., | |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of Orange County, Mary Kreber Varipapa, Judge.  Affirmed.

Jacques Alexander Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

\*          \*          \*

This is an appeal by Carrie P., the maternal grandmother (Carrie or the grandmother), of the juvenile court's denial of her petition pursuant to Welfare and Institutions Code section 388.[1]  After Carrie became caregiver to the child, Jacob D., at the outset of dependency, he was removed when her placement application was initially denied.  She eventually successfully challenged the denial.  She filed the instant petition, but by the time it was heard, Jacob had been with his current caregivers, who wanted to adopt him, for over two years.  While the court found that Carrie would be a great caretaker, it determined that Jacob's need for stability was paramount and that removing him from his potential adoptive parents would not be in his best interest.  The court, therefore, denied the petition, and ultimately terminated parental rights, selecting adoption as the permanent plan for Jacob.  Carrie now appeals.

I

FACTS

Jacob was born in December 2018.  Because of his parents' substance abuse, he was removed from their care, and Orange County Social Services Agency (SSA) filed a petition pursuant to section 300.  SSA contacted Carrie and asked her if she wanted to pursue placement.  Carrie had not seen the mother since 2015, but she had been the legal guardian of E.M., the mother's older child, for six years.  She was willing to undergo a background check and take required classes.  Jacob was placed with Carrie as an emergency placement when he was approximately two weeks old, after Carrie had undergone a home assessment.

At the jurisdiction and disposition hearing in February 2019, the parents did not appear, and their whereabouts were unknown.  The court sustained the petition and

---

[1] Subsequent statutory references are to the Welfare and Institutions Code.

2

ordered SSA to place the child. No services were ordered for the parents, but the court set a six-month review hearing in August.

On April 2, the Resource Family Approval (RFA) social worker, Collen Owen, interviewed Carrie at her home. Carrie had completed a lengthy assessment at that point, which covered "parenting styles, risk factors, criminal history, history of domestic violence, history of abuse, past traumas, the applicant's upbringing, and how each affects the applicant today and ability to care for a child." Before the interview, Owen reviewed the state's Child Abuse Central Index (CACI), which revealed three incidents involving Carrie. Owen had started the process of obtaining the records regarding each entry, but she did not have copies of police reports or many of the original documents at that time.

During the interview, Owen reviewed Carrie's assessment with her line-by-line to confirm the information was correct. She "discussed the importance of being honest and forthcoming during the interview." The details of the interview and contradictory records will be discussed below in the context of Owen's report, but in sum, Carrie denied having a criminal record, spanking or hitting her children, being investigated for abuse or neglect, or being involved in an involuntary dependency proceeding.

On April 18, SSA filed an ex parte application to inform the court that placement with Carrie would not be approved due to a history of child abuse, drug abuse, and being the perpetrator in a domestic violence case. Owen acknowledged that it had been many years since those events had occurred and that Carrie appeared to have changed her life. But the social worker was "unable to mitigate the circumstances" because Carrie "minimized and denied all past history of child abuse, drug abuse, and domestic violence."

3

Accordingly, on April 11, SSA removed Jacob from Carrie's home. He was placed with C.B. and N.C. (the foster parents), who would continue as his caregivers throughout the pendency of the case.

On May 28, Carrie filed a section 388 petition asking the court to return Jacob to her. Her declaration stated that the events which led SSA to remove Jacob were more than 25 years ago. The court set Carrie's petition for a prima facie hearing and ordered supervised visitation with Jacob twice a week for two hours. This petition was not ultimately heard until August 2021 and is the subject of this appeal.

In preparation for the six-month review hearing, SSA submitted a report to the court which stated that the foster parents were meeting all of Jacob's physical, emotional, and medical needs. The child appeared happy and playful during SSA's visits. The social worker described him as "an adorable, petite six-month old infant" who was sitting with little assistance, mobile, and verbal. He was well-adjusted in his placement and the social worker was "confident in the current caregiver[s]' ability to recognize issues and seek assistance for the child should his mental or emotional status change." The foster parents were supportive of reunification, if it was to be offered, but had also indicated they were interested in adopting Jacob.

Carrie's visits were being supervised by the foster parents at the child welfare office. His half-brother, E.M., also attended. The first visits were uneasy, and the foster mother noted that Jacob cried more than she had previously seen him cry and was fussy the next day. Carrie thanked the foster parents and stated Jacob was doing well because of them. To the social worker, Carrie described the caregivers as "awesome people" and said Jacob was "being well cared for." Carrie requested increased visits, but SSA declined due to Jacob's reactions at the visits to that point. SSA recommended the matter be scheduled for a hearing pursuant to section 366.26 (permanency planning hearing).

4

At the six-month review hearing on August 19, the court continued dependency and scheduled a permanency planning hearing. The court also ordered unsupervised visits for Carrie, but noted that SSA could change visits to supervised if necessary upon notice to counsel. The hearing on Carrie's section 388 petition, scheduled for that day, was continued.

Some three weeks later, on September 10, SSA filed an ex parte application to inform the court that Carrie's visits had been changed to supervised. Shortly after the six-month review hearing, the social worker met with the foster parents and discussed Carrie's visits. "The caregivers expressed it is evident to them [that Carrie] loves the child very much and wants to spend time with him, however, they further expressed their concern about how the child reacts to the grandmother during the visits, her ability to care for both the child, Jacob[,] and his half sibling at the same time, as well as how Jacob acts in the placement home following the visits." A log of visits the foster parents were keeping referenced various difficulties, including a lack of supervision for E.M. while Carrie was interacting with Jacob, and Jacob's tendency to cry during visits and act "fussy and uncomfortable." Jacob's behavior after visits was also unhappy, which was unusual for him, and included difficulty sleeping. All of these behaviors were repeated after multiple visits. Based on these details, SSA reverted to supervised visits.

Owen, the RFA social worker, had been investigating the details of Carrie's background, and her findings were reported to the court at length for the first time. During their interview, Carrie had told Owen that she had never spanked a child or used any form of corporal punishment. She stated she had only one arrest, one child abuse investigation, and one three-month period of substance abuse. Carrie said the outcome of the child abuse investigation was that the allegations were determined to be false. Carrie claimed the incident had something to do with her daughter making up a story so she would not have to go to school. Carrie also said "she voluntarily asked for her children to

5

be" placed in foster care so they would not have to be exposed to Carrie's father's drinking. She said the children were in foster care for a year until she found her own place to live, at which time the children were returned to her. Aside from this occasion, Carrie stated she had never been investigated for child abuse or neglect, and had never participated in services or substance abuse programs.

Arrest records and child abuse history records showed a completely different story on the topics of substance abuse, domestic violence, child abuse and neglect, dependency history, and criminal history. When confronted with these records, Carrie denied they pertained to her and stated she had never heard of them. Despite having signed a statement under penalty of perjury that she had never been arrested for a crime against a child or for spousal/cohabitant abuse, and that she had never been convicted of a crime in California, records indicated otherwise. In 1992, Carrie was arrested for assault on a cohabitant/significant other. She told the social worker she did "not recall being arrested and was, therefore, unable to explain her underlying conduct." Records also revealed arrests and convictions for drug-related offenses.

CACI showed three substantiated allegations of physical abuse by Carrie. SSA records indicated that Carrie was provided with family maintenance services on two occasions. The social worker in 1992 noted that Carrie was "in complete denial, refused all drug treatment programs, failed appointments with SSA" and that she was "not cooperative." After failing to cooperate with voluntary services, petitions were filed on Carrie's three minor children. The applications for petitions alleged the children had seen Carrie "using marijuana, speed, and syringes at home." They knew details of how "speed" was packaged and how it was "cooked," which they had learned from watching Carrie and her boyfriends.

The applications also alleged physical abuse by Carrie with fists, ping-pong paddles, belts, slaps, punches to the head and face, and pulling hair, some of which

6

resulted in injuries. Further, the applications alleged Carrie's 18-year-old child had recently moved into the home despite allegations that he had molested one of the younger children four years earlier. The petitions were filed, the children were declared dependents, and they were in foster care for over a year.

A police report and SSA notes indicate that Riverside County had, prior to the Orange County dependency case, conducted at least 15 allegations into abuse or neglect by Carrie.

When asked about these records and her prior statements, Carrie stated she did not recall being investigated for child abuse or neglect other than the one incident she mentioned. She later said there might have been "a couple of them," and stated she could not remember. She again denied all physical abuse of her children.

Based on Carrie's false and misleading statements to SSA as well as her history, SSA denied Carrie's application to be an approved resource family. SSA also noted that the reason Carrie had been permitted to become legal guardian to E.M. was because SSA had not been involved at the time. She sought guardianship after the closure of a voluntary family services case, and she admitted not involving SSA deliberately.

Carrie appealed SSA's decision. Her section 388 motion was continued multiple times, at her request.

In an order dated September 17, the court ordered SSA to assess neutral monitors. Carrie was referred to a contracting agency and placed on a waitlist. The social worker also made the Orangewood visitation center available.

In an interim report dated October 31, SSA reported that Jacob remained with the foster parents and Carrie's supervised visits had continued. When a scheduled visit was canceled due to Carrie being ill, the foster parents noted that it had been several weeks since the last visit, and Jacob's demeanor had improved, with no fussiness or

7

problems sleeping. When visits resumed, so did issues with crying and behavior on Jacob's part, although Carrie's responses were always calm and appropriate. Issues continued to recur regarding Carrie's ability to supervise E.M. while interacting with Jacob as well as Jacob's emotional state after visits.

In late November, Jacob had a urological outpatient surgical procedure. In mid-December, his foster parents reported he was doing well and his incisions had healed. The foster parents also reported that "Jacob has blossomed into a happy, silly, smart, and adventurous baby . . . ." Their report to SSA evidenced a high level of involvement and support for him.

In January 2020, SSA provided an interim report to the court. Visits between Carrie, E.M., and Jacob had continued. Beginning in November 2019, visits had taken place at Orangewood. The foster parents reported Jacob continued to have trouble sleeping after visits, and his behavior was "fussy, and 'not his regular happy self.'"

A visit that was observed by the social worker confirmed the foster parents' reports that Carrie's presence seemed to upset Jacob. Carrie greeted Jacob, and "as soon as the child made eye contact with the maternal grandmother, the child immediately tensed his body by lifting his shoulders, scrunching his face and began intensely crying. The maternal grandmother was appropriate in her reaction, as she continued to gently speak to him and reassured him he was fine verbally; however, the child's crying escalated. . . . The foster father, picked him up, verbally reassured the child he was okay and rubbed his back while speaking to him in a low tone of voice. Upon the foster father picking the child up, the child stopped crying within several seconds. The maternal grandmother moved towards the child and foster father, speaking to the child with a gentle tone of voice, the child then turned his body into the foster father's chest, moving away from the maternal grandmother. The maternal grandmother attempted to interact with the child; however, the child held onto the foster father with an even tighter grip and

8

looked at the maternal grandmother with a blank stare." As soon as Jacob was handed back to Carrie, he began to cry again. Carrie's reaction and demeanor in response were appropriate, and at times Carrie was able to soothe Jacob enough that he would stop crying. Crying was also reported by the visitation center's staff on other occasions. Carrie would react appropriately and attempted to engage Jacob with appropriate toys.

Also in January 2020, Carrie requested de facto parent status. This motion was set for hearing. The court eventually granted de facto parent status to both Carrie and the foster parents.

In two February interim review reports, SSA informed the court that Jacob continued to do well at his foster parents' home and participated in age-appropriate activities. He was meeting developmental milestones and had received appropriate medical care. He was learning to walk. The foster parents reported he continued to have difficulties following visits with Carrie, although Orangewood reported that a recent visit with her had gone well.

In March, SSA contacted several potential visitation monitors that Carrie had provided. One of them, Lynne H., was approved. But in the interim COVID-19 restrictions went into effect.

In an addendums report in May and July, SSA updated the court on Jacob's progress, which continued to be positive, despite the restrictions posed by COVID-19. Jacob had learned to walk and was learning to talk. Carrie participated in video visits, which generally went well. Carrie was able to have an in-person visit with Jacob in July.

In an August addendum report, SSA recommended that Jacob remain with the foster parents. SSA noted that he was strongly bonded to them and removing him from their care would be detrimental and traumatic. The foster parents were supportive of future contact with Carrie and E.M. SSA opined that the permanent plan of adoption was the appropriate choice.

9

In other reports during this period, SSA reported that Jacob continued to progress. He still experienced some difficulties in leaving the foster parents for visits with Carrie but his reactions were not as severe as they had once been. The visits were supervised by Carrie's friend Lynne H., and Carrie reported they went well.

In November 2020, the Administrative Review Hearing judge (the ARH judge) provided a detailed ruling on Carrie's appeal of the RFA denial. The ARH judge noted that the basis for the denial was Carrie's failure to cooperate with the investigation by making false and misleading statements, her failure to pass the background check with respect to criminal history and child abuse/neglect, and her past conduct that posed a risk to a minor. During the hearing on Carrie's appeal, the ARH judge heard testimony from Owen, Carrie (who accused Owen of lying), E.M., and character witnesses offered by Carrie. Due to the nature of the appeal, neither Jacob's social worker nor the foster parents testified.

The ARH judge noted that Carrie "is not a very accurate historian of events, including her more recent interactions with Ms. Owen." To the extent that Owen's testimony conflicted with Carrie's, the ARH judge found Owen to be the more credible of the two. "For example, Ms. Owen's account for how she began the interview and reviewed the application line by line was more credible than respondent's testimony that it did not occur. Likewise, [Carrie]'s accusation that Ms. Owen did not want to listen to what [Carrie] had to say about her prior misconduct or rehabilitation is not credible. Finally, [Carrie] disputed Ms. Owen's claim that Ms. Owen asked for more details about the CPS contacts on April 11, and adamantly and repeatedly maintained that the phone conversation lasted only seconds. This claim was refuted by the phone records."

The ARH judge, however, did not find that Carrie had necessarily intentionally lied or had the intent to mislead or deceive. "Rather, some of her answers to questions by Ms. Owen and at hearing reflect carelessness in providing accurate

10

answers." Nonetheless, Carrie's statements about her past drug and alcohol use, physical abuse of her children, criminal history, and dependency history, were either false or misleading. Therefore, cause existed to deny the RFA application on that ground.

With respect to Carrie's past conduct posing a risk or threat, Carrie's completion of a drug court program was evidence of rehabilitation following a drug arrest. The ARH judge found certain records pertaining to child abuse, such as the Carrie's children's statements to police officers included in police reports, inadmissible. "[Carrie]'s previous drug and alcohol use up to 2002, and involvement in a simple assault in 1992, do not pose a threat to any child that would be in [Carrie]'s care. The incidents are remote in time and [Carrie] established that she has been rehabilitated such that she is unlikely to pose a threat in the future." "The false and misleading statements [Carrie] made during the investigation are more concerning . . . ." Also of concern was Carrie's attempt to "impugn[] the honesty and integrity of Ms. Owen by asserting that aspects of Ms. Owen's report and testimony were not true. Her assertion that a long phone conversation on April 11, 2019, did not occur as testified to by Ms. Owen, is the most prominent example, for which [Carrie]'s claim was flatly refuted by the phone records. It is a very serious allegation to accuse a highly experienced social worker with not telling the truth, and that [Carrie] has been determined to be far less credible than Ms. Owen, should be cause for [Carrie] to reflect on her actions."

There was, however, substantial evidence that Carrie was a good parent to E.M., and therefore evidence she would be a good parent to Jacob. The ARH judge concluded: "While cause exists to deny [Carrie]'s RFA application . . . , a preponderance of evidence established that [Carrie] meets the qualifications to be a resource family parent, is of reputable and responsible character, and is able to comply with the law and Written Directives. Therefore, the County's decision to deny the application is reversed." The matter was remanded to SSA to complete the RFA assessment.

11

The ARH judge noted: "[I]t is impressed upon [Carrie] that this was a very close decision, and there remains serious concern about her credibility. Indeed, if her application is ultimately approved, she will need to work closely with the County in the future—it can be expected that *any* further instances of providing false information could result in further administrative action."

Meanwhile, visits continued to go generally well, although there was some resistance by Jacob. The foster parents began supervising again because Carrie's monitor was not available.

After the ARH judge's decision, Jacob's social worker was contacted by a new RFA social worker assigned to continue the assessment. The RFA social worker approved Carrie for placement, but Jacob's social worker did not agree and recommended Jacob remain with the foster parents.

In August 2021, the court began hearings on instant section 388 petition as well as the permanency planning hearing. Carrie had numerous witnesses testify on her behalf, including E.M., one of her daughters, an autism specialist who worked with E.M., and a home care professional. All of them testified positively about Carrie's parenting skills.

Carrie testified on her own behalf. She used much of her testimony to complain about Jacob's removal, the visitation schedule, and the foster parents' presence preventing her from bonding with Jacob. She admitted the foster parents did an "excellent job" with Jacob. She also testified she believed she had been truthful in her first RFA application, but said she had provided much more information during the process after the decision by the ALH judge. She said the second time, "the form was clearer in what it was asking."

Carrie admitted drug use, but said she never abused drugs, and only used for a few months. With respect to the dependency case with her own children, she

12

acknowledged it occurred, but stated it was not due to any specific allegation she could recollect. She continued to claim the children were "voluntarily placed" because she did not want them around her own father, who would drink in the home. But Carrie also testified she had a plan she was required to complete, which belied her claim that the placement was voluntary.

The social worker who had approved the second RFA assessment testified that Carrie was cooperative during the process.

Jacob's longtime social worker, Vicki Simpson, also testified. She did not think Carrie was unsafe to be around. The reason she had not expanded Carrie's visits was because Jacob's behavior indicated he wanted the foster parents present. She opined that changing Jacob's placement at that point would not be in his best interest. She came to that conclusion based on the length of time in their care and they were the only parents he had known. The foster parents also took good care of Jacob and met all his needs, and they had been approved to adopt. The foster parents had expressed willingness to sign a postadoption contract for visits for Carrie and E.M.

Simpson testified about the relationship between Jacob and the foster parents based on her observations. "I see him solicit affection from them or give affection without them soliciting that from him. I see him touch them with gentle touches, soft tone of voice. It's always very calm and appropriate in the house, I guess, I could say. It's comfortable there. [¶] I've also met them outside of the home at the park before a visit or after a visit, and I see the same types of interactions [in] public." This was in contrasts to Carrie's visits, which continued to be somewhat of a "struggle" for Jacob. He wanted the foster parents close by, and he had started having night terrors again.

Jacob's foster mother also testified and stated that Carrie was cordial and respectful. She and the foster father were committed to facilitating a relationship

13

between Jacob, Carrie, E.M., and extended family members if the foster parents adopted Jacob. During the time Jacob had been in the foster parents' care, they had provided for his day-to-day needs and emotional support. He looked to them when he was sad, and for comfort when he was distraught. Jacob called the foster parents "Momma," and "Papa," and had recently begun calling them "Mommy" and "Daddy."

The court issued its ruling on December 6, 2021, after the conclusion of testimony and argument. The court commended both Carrie and the foster parents for their interactions with Jacob, noting that it was deciding "between two very favorable homes." The court also noted that E.M. had flourished in Carrie's care. The court did have concerns about how SSA had dealt with Carrie after Jacob's removal from her care.[2] The court believed that Carrie would protect Jacob if he were in her care and noted that her history does not define her. Further, the court discussed the relative placement preference set forth in section 361.3, and stated its belief that Jacob would be in a safe and secure environment in her home.

Jacob, however, had not lived with her since he was approximately four months old, and had spent the remainder of his two and a half years with the foster parents. It was not ultimately in his best interest to be removed from that stable environment. The court then denied the section 388 petition. It found Jacob adoptable, determined that adoption was the permanent plan, and terminated parental rights. Carrie now appeals.

## II

## DISCUSSION

---

[2] The court ultimately found no wrongdoing by SSA. "[This] wasn't anyone's fault or any potential misdoing or mishandling of this case by social services – that is not something that the court is finding . . . ."

14

*Statutory Framework and Standard of Review*

The only issue before us is whether the court properly denied Carrie's section 388 petition. In pertinent part, section 388, subdivision (a)(1), provides: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order [the] court previously made . . . ." The burden of proof is on the petitioning party, who "must also show that the proposed change would promote the best interests of the child." (*In re J.C.* (2014) 226 Cal.App.4th 503, 525 (*J.C.*).)

"Whether the juvenile court should modify a previously made order rests within its discretion, and its determination may not be disturbed unless there has been a clear abuse of discretion. [Citation.] '. . . "[']The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'"'" (*J.C.*, *supra*, 226 Cal.App.4th 503, 525-526.) The facts are reviewed for substantial evidence, but we do not substitute our own inferences for those of the juvenile court, nor do we resolve conflicts in or weigh the evidence. (*In re A.E.* (2014) 228 Ca1.App.4th 820, 826; *In re Hailey T.* (2012) 212 Cal.App.4th 139, 146-147; *In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1505.) We review the order in the light most favorable to its findings. (*In re Hailey T.*, at pp. 146-147.)

*Best Interests of the Child*

There is no doubt that a change of circumstances took place here with respect to Carrie's status as a potential caregiver, and we need not belabor that part of the analysis. The reason the court denied the section 388 petition is because over two and a

15

half years had elapsed since Jacob had been in Carrie's care. This fact is indisputably true and supported by more than substantial evidence.

In *J.C.*, this court addressed a situation where the mother had taken substantial steps to address a substance abuse problem, sufficient to establish changed circumstances. (*J.C.*, *supra*, 226 Cal.App.4th at p. 526.) The child, however, had been out of the mother's custody for her entire life by that point, two and a half years. (*Ibid.*) Focusing on the child's need for permanency and stability, this court stated: "In short, Mother's evidence did not establish J.C.'s need for permanency and stability would be advanced by an order returning J.C. to her care. The evidence showed J.C. had a loving and stable placement with her maternal aunt Jessica, who had cared for J.C. since her birth. Jessica had assumed full parental responsibilities and care for J.C., and by the time of the hearing on the section 388 petition, J.C. was two and one-half years old. Jessica was the only constant and stable parent J.C. had ever known. Jessica and her two daughters felt like J.C. was part of their family. [The social worker] had no doubt J.C. and Jessica were strongly bonded to each other. Mother does not dispute Jessica and J.C.'s relationship, and in her petition she stated she would strive to preserve that bond if granted custody or a temporary release. Mother failed to present any evidence J.C.'s best interests in *permanency and stability* would be furthered by the proposed modification under *In re Stephanie M.* [(1994) 7 Cal.4th 295, 317]." (*Ibid.*)

In *In re Stephanie M.*, *supra*, 7 Cal.4th at page 317, the California Supreme Court stated: "In any custody determination, a primary consideration in determining the child's best interest is the goal of assuring stability and continuity. [Citation.] 'When custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role. That need will often dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child.'"

Pointing to the relative preference set forth in section 361.3, Carrie also argues that Jacob should have been returned to her care after the ruling by the ARH judge. She blames the social worker for not allowing unsupervised visits to occur. She seems to imply that SSA was less than candid with the court and outright accuses SSA of bad faith. The court found otherwise and we find substantial evidence to support the court's determination.

Carrie also points out, correctly, that it was not lack of effort on her part that kept Jacob out of her care. While this is true, it is ultimately not, as Carrie admits, the "linchpin" of placement – that must be the best interest of the child.

Citing a number of cases in which an appellate court reversed a juvenile court's decision regarding relative placement, Carrie argues we should do the same, not out of Jacob's best interest, but because of SSA's purported bad faith. She fails, however, to discuss important factual differences between those cases and this one. In *Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, for example, this court granted writ relief after SSA unilaterally decided not to evaluate a grandmother for placement. Such is not the case here. Similarly, in *In re R.T.* (2015) 232 Cal.App.4th 1284, 1291, 1297, 1299, social services and the juvenile court "disregarded" relative placement and failed to give "good faith consideration" to relatives. Again, that is not the case here. The other cases she cites were all situations in which the relatives were not given the full consideration section 361.3 mandates. (See *In re Isabella G.* (2016) 246 Cal.App.4th 708, *In re Esperanza C.* (2008) 165 Cal.App.4th 1042.)

This case is very different. The court in this matter gave every consideration to Carrie's status as a relative. That preference has been given respect throughout the entire proceeding – if Carrie were not a relative, Jacob's placement would almost certainly have been decided long ago. The statutory requirements for consideration of relative placement have been more than met. To the extent she claims

17

she need not meet the requirements of a section 388 petition *because* of the relative preference, we disagree, and she cites no case that says otherwise.[3]

Ultimately, to meet the requirements of a section 388 petition, decisions about placement must be made in the best interest of the child, not the potential caregiver. Both the facts and the law are clear in this case. Jacob was thriving under the care of his foster parents and demonstrated emotional attachment to them. Carrie, therefore, did not meet her burden to establish that Jacob's best interest would be served by removing him, at this late date, from the only parents he had ever truly known. The juvenile court did not abuse its discretion in denying the section 388 petition.

## III

## DISPOSITION

The order is affirmed.

---

[3] Further, even if we were deciding the case under the standard Carrie suggests, we would have no difficulty deciding that Jacob would be greatly harmed by being removed from his caregivers at this point.

18

MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


ZELON, J.*


*Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19